J-S26040-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
                                                          :              PENNSYLVANIA

                              v.                               :

ROLAND GATHRIGHT                      :

                  Appellant          :     No. 3748 EDA 2016

Appeal from the Judgment of Sentence June 24, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001034-2009,
CP-51-CR-0001055-2009

BEFORE:    BENDER, P.J.E., BOWES, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:             **FILED MAY 30, 2018**

Appellant, Roland Gathright ("Gathright"), appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following his guilty plea to two counts of rape of a child with serious bodily injury, two counts of unlawful contact with a minor, two counts of incest, two counts of endangering the welfare of a child-course of conduct, and two counts of indecent assault.[1] After a careful review, we affirm.

The relevant facts and procedural history are as follows: On May 17, 2011, Gathright, who was represented by counsel, entered an open guilty plea

---

[1] 18 Pa.C.S.A. §§ 3121(d), 6318, 4302, 4304, 3126, respectively.

---

\*    Former Justice specially assigned to the Superior Court.

to the charges indicated *supra*. Gathright's guilty plea stemmed from charges

that he raped his two nieces, K.B., who was two years old at the time of the

incident in the spring of 2008, and A.B., who was ten years old at the time.[2]

Specifically, at the guilty plea hearing, the Commonwealth made the following

relevant evidentiary proffer:

> Your honor, if this case were to proceed to trial, there are numerous witnesses that the Commonwealth would have called to testify. The first person that I would like to draw your attention to is [K.F.]. . . .She would testify that [Gathright] is her biological brother. That back in October of 2007, she invited her brother to come and live in her home, and he remained in that home and lived at that home with her, her two-year-old daughter, [K.B.], and her husband, [R.F.].
>
> In the spring of 2008, there had been certain things that the family noticed. [K.F.] would testify that during the spring and into the summer that she had talked to her daughter, [K.B.], about whether or not anybody had touched her.
>
> ***
>
> During that time she would testify that the child did say to her that Uncle Ro-Ro, [this] is what they called [Gathright], . . . hurt her pootie cat. During that time she would testify that she didn't think much of it as her child was being potty trained and the whole family was looking after her and attempting to help out in that potty training.
>
> Sometime in the beginning of the summer, she noticed that there was a discharge that her daughter was having. Towards the end of the summer, Your Honor, that discharge changed in color from a yellow, whitish to a green discharge. It was in September of 2008 that she took her daughter to the doctor because her daughter was complaining of pain to that area and also for the discharge.
>
> At that time they believed that what was happening to her daughter was a normal infection as a result of potty training,

---

[2] The Commonwealth filed charges against Gathright at two separate docket numbers; the cases were consolidated in the trial court.

something that would happen normally with a two-year-old. To her dismay, when she took the child to the hospital, she and her husband were informed that the child [ ] tested positive for gonorrhea.

Your Honor, [R.F.], is the only other male that was present and had access to the child at this time[.] He has since passed away at the beginning of this month. However, [K.F.] would testify, and also I would have introduced at trial in this particular case, medical records indicating that the day after his stepdaughter was treated—or was tested positive for gonorrhea, he did go and was tested for any and all STDs, including HIV, including gonorrhea, chlamydia, and numerous other STDs, and would have at the time of trial called representatives from the place where he was [tested], introduced the medical records. The doctor who actually performed the test did recall that incident very specifically. She was on standby to testify in this particular trial that she remembered [R.F.], she remembered testing him. She remembered the specifics of why he was there, and she would testify that he tested negative to all STDs the day after the child presented with gonorrhea.

Additionally, representatives from the Department of Human Services would also testify that they had to clear two individuals, [Gathright] that is seated before you and [R.F.]. They would testify that [R.F.] was more than cooperative with the investigation [and] that he was immediately cleared following the initial presentation of the two-year-old with gonorrhea.

Your Honor, shortly thereafter the family was discussing the fact that a youngster in their family had tested positive for gonorrhea. [K.F.], her brother, [S.B.], is the father of [A.B.]. He is the biological brother of [Gathright], and the biological brother of [K.F.].

During their conversations it had become alerted to the family that [K.B.] had tested positive for gonorrhea. At that time it had been discussed with the family that [A.B.] called her aunt which [sic] she had been spending a significant portion of the summer with. Nearly every weekend she would go to her aunt's house at that location and she would spend weekends with her aunt, and also during that time she would testify, and so would [K.F.], that [Gathright] [was] over that summer, although he was no longer living there, would come over for visits.

She telephoned her aunt when she heard about her younger [cousin] and told her that sometime throughout the end of the

summer, she can't give an exact date, but she believes the summer was coming to a close, that there were two occasions in which she was present at that location and it was just her, [Gathright] and her two-year-old cousin,[K.B.]. They were alone with [Gathright] and [Gathright] inserted his penis into her vagina, [A.B.], as well as her two-year-old cousin. And that happened on two occasions that summer.

She told her aunt and she later told police officers, and she would have been called in this particular trial to testify as to the details of those incidents.

Your Honor, [S.B.] would also testify that he made numerous attempts to bring his brother in to authorities. The Commonwealth would have called Detective Claire Duckworth in this particular case and introduced a statement on behalf of [Gathright], and also would have brought in evidence through the Pennsylvania—through State Department of Pennsylvania, and also through Philadelphia city officials, that checks were done to see whether or not [Gathright] at any time had been tested anytime from September until December for gonorrhea. At no time in the State of Pennsylvania did we have a record of him being checked in under that name or being treated in Pennsylvania. They further would have testified they only would have been alerted to any positive testing.

\*\*\*

The first record we have of [Gathright] who was testing for gonorrhea in this particular case or any STD isn't until September of 2008,[3] three months after he gave a statement and he was made aware of the charges in this particular case and that he was a suspect.

Additionally, Your Honor, in this particular case, amongst other people that I have would have [brought in to testify,] I would have had an expert in the field of child abuse. That expert would have been Dr. Sarah Frioux. . . .She would testify that a child being diagnosed with gonorrhea is diagnostic of sexual abuse, meaning that both of these children medically were sexually abused. She would also further testify that gonorrhea, a person

---

[3] At the hearing, defense counsel indicated that the prosecutor misstated the month Gathright had been tested. He indicated that Gathright was tested for STDs when he turned himself in to the police in December of 2008 (as opposed to September of 2008). N.T., 5/17/11, at 53.

can be spontaneously cured without treatment, which means that he could have it and then he could be resolved of it through his own body's mechanism of treating that disease.

She would also testify that [Gathright], if he had it any time during the time of the incident, all the way up until the time that he tested negative. . .that he also—if he was being treated for any other illness by penicillin or any other antibiotic, that, too, would have cleared up the treatment, the gonorrhea in this particular case.

The Commonwealth also would have introduced documents of [Gathright's] medical history while in custody, medical records of both of the children during the time of the incident and post the incident, DHS records, any statements of the children, and would have called other witnesses in this particular trial.

This, Your Honor, although it's at length, is only a summary of what I would have presented if this case had gone to trial.

Additionally, Your Honor, in this particular case, I did further go to have [M.C.] who is somebody that [Gathright] admitted to having sexual intercourse. I was able to ascertain that over the course of ten years that she tested positive for chlamydia and gonorrhea approximately five times, and I would have also introduced into the record any and all tests that she received in the State of New Jersey at the time and around the time of this incident.

In this particular case, this happened in 2008. [K.B.] who is now approximately five years old, although she was unable at the time to verbalize what happened, I had a discussion with her and she would have been present and she would have testified in this trial as a five-year-old and she would have testified that she did see her Uncle Ro-Ro's private parts and that he put his private part in her and that it hurt. And numerous family members throughout the course of the investigation would testify that the child did state to them that Uncle Ro-Ro hurt my pootie cat on my private part.

N.T., 5/17/11, at 43-52.

Following Gathright's entry of a guilty plea, the two cases were continued to August 11, 2011, for a Megan's Law assessment, presentence

- 5 -

investigation, and a mental health evaluation.  On August 10, 2011, Gathright filed a counseled presentence motion seeking to withdraw his guilty plea, as well as a motion for a change of appointed counsel.  On September 27, 2011, the trial court determined Gathright was not a sexually violent predator, permitted guilty plea counsel to withdraw, and appointed new counsel.

Represented by new counsel, Gathright proceeded to a hearing on his presentence motion to withdraw his guilty plea.  At the hearing, Gathright's new counsel called guilty plea counsel to testify.  The following relevant exchange occurred between Gathright's new counsel and guilty plea counsel:

> **Q:** [Guilty plea counsel,] what, if anything, did you say to Roland Gathright on May 17, 2011[,] before he entered his guilty plea concerning his ability to withdraw that guilty plea?
>
> **A:** First, let me indicate that Mr. Gathright and I that morning had several conversations.  And there was a hearing held before Mr. Gathright had decided to plead guilty.  And at the conclusion of that hearing after [the prosecutor] indicated to Mr. Gathright on the record what possible sentence he may face if he were convicted on the charges and after some discussion with Judge Cohen, as to based on what Judge Cohen has done in the past with respect to sentencing, I had a conversation with Mr. Gathright.  And I asked him, what did he want to do?  And he said that he wanted to plead guilty.  And I said that I had a form I had to get together, a written colloquy form and I proceeded to fill out the form with Mr. Gathright.  I did indicate to Mr. Gathright that prior to sentencing that he would be permitted to ask me to file a motion with the [trial] [c]ourt to withdraw his guilty plea, that generally speaking, and I believe that this is the Rules of Criminal Procedure that the [trial] [c]ourt is expected to look at those motions favorably.
>
> I didn't guarantee—I didn't indicate to him that he had an absolute right to withdraw his guilty plea.  But, generally speaking, as a matter of practice, that if he were to change his mind before sentencing, he would need to indicate that to me and I would file the appropriate motion with the [trial] [c]ourt.  And

- 6 -

we would have a hearing, and the judge would have to decide whether or not to permit him to withdraw his guilty plea. But I didn't necessarily stress that there would be an issue with that. I didn't suggest that that most likely would be granted, but, again, I didn't say it was an absolute right. And, of course, post sentencing I indicated to him that—well, Mr. Gathright's concern was with respect to what sentence he would receive, because it was an open plea. So I had indicated to Mr. Gathright that upon sentencing if he received a sentence that he thought was not within his scope of expectations, based on my conversations with him, that he would have a right to have me file a motion, immediate motion, within 10 days or within 30 days.

The motion within 10 days would be before the [trial] court. The motion within 30 days would be with the Superior Court, but it would have to meet a certain standard in order for him to be able to prevail on withdrawal of his guilty plea post sentencing. And it was in the colloquy form. I reviewed the colloquy form with him.

\*\*\*

Also, I should indicate that, of course, Judge Cohen does extensive, extensive colloquy during the guilty plea process itself. So anything that I might have missed in my conversations with him were later thoroughly gone over by Judge Cohen before Mr. Gathright entered his guilty plea.

**Q:** [W]hat, if anything, did you say to Mr. Gathright about his ability to withdraw his guilty plea?

**A:** I limited my answer to specifically focus on what recourse he would have in terms of withdrawing his guilty plea either before sentencing or after sentencing.

**Q:** Number two, did you ever tell Mr. Gathright that he could withdraw his guilty plea at any time?

**A:** No, I did not.

**Q:** Number 3, did you ever tell Mr. Gathright's family members, [his mother] or any other of his family members, to go home prior to his entering his guilty plea?

**A:** No, I did not. And I could say that the victims were in the room with the family which is part of his family. And [his mother] left because, as I recall, she had some sort of—somebody in the hospital and she needed to leave. And I know that she was upset but I did not have a conversation with—as far as I know, the only

member there for Mr. Gathright was the mother. At no point did I ever tell [his mother] to leave prior to Mr. Gathright entering his guilty plea.

N.T., 6/15/12, at 36-41.

Gathright testified at the hearing on his motion to withdraw his guilty plea. He testified on direct-examination that he was innocent of the charges. N.T., 6/20/12, at 8-9. After being confronted on cross-examination with excerpts from the guilty plea hearing at which Gathright acknowledged his guilt, the following relevant exchange occurred between Gathright and his counsel on redirect-examination;

**Q:** The district attorney just went through a number of questions where you answered yes or said the word guilty a number of times; do you recall that?

**A:** Yes.

**Q:** Why did you say those words to Judge Cohen on May 17, 2011[,] if today you're telling him that you're innocent of these charges?

**A:** Why did I say I was guilty?

**Q:** Yes.

**A:** Because [guilty plea counsel] advised me to plead guilty. And she told me that if I lose, I can get up to life in prison. And she said that if I plead guilty, I can be home within—by the time I'm 35.

N.T., 6/20/12, at 32.

In opposition to Gathright's motion to withdraw his guilty plea, the Commonwealth called K.B.'s mother, K.F., to testify. K.F. confirmed Gathright is her brother. *Id.* at 34. She indicated K.B. began behaving erratically when she and the district attorney were preparing for Gathright's trial. *Id.* at 36.

She noted that K.B. initially had many nightmares related to the molestation; however, the number of nightmares has decreased over time. *Id.* at 36-37. K.F. testified she took K.B. to a therapist, and "[s]he seems like now she's a normal kid." *Id.* at 38-39. She testified that she is concerned that, if K.B. has to prepare again for Gathright to go to trial, K.B. will regress and have emotional difficulties. *Id.* at 39-40.

The Commonwealth also called A.B.'s father, S.B., to testify. S.B. confirmed Gathright is his brother. *Id.* at 41. S.B. indicated that, after A.B. testified at Gathright's preliminary hearing she "had to go [to] counseling. She was really shaky, real[ly] scared, didn't trust nobody [*sic*], not even [her father]." *Id.* at 42-43. He stated that after the molestation, from January of 2009 until May of 2011, A.B. was "in a lot of fights. . .[and] got kicked out of school for fighting." *Id.* at 43. However, after she learned that Gathright had pled guilty, A.B.'s behavior improved. *Id.* at 44. S.B. testified that, when A.B. discovered that Gathright was seeking to withdraw his guilty plea, she became upset and immediately got into another fight at school. *Id.* at 45-46. S.B. testified that if A.B. has to testify against her uncle she will suffer emotional harm. *Id.* at 47.

At the conclusion of the hearing, the Commonwealth argued Gathright "is playing games with the court system and he is trying to play fast and loose with the Commonwealth's ability to present a case against him." *Id.* at 55-56. The Commonwealth also argued it would be substantially prejudiced

because of the emotional trauma, which the victims would suffer by reliving the crimes and testifying after the passage of so much time. *Id.* at 61-63.

On June 20, 2012, at the conclusion of the hearing, the trial court ordered that Gathright could withdraw his guilty plea. The case was then listed for trial; however, on July 20, 2012, the Commonwealth filed a notice of appeal.

On appeal, in an unpublished memorandum filed on February 12, 2014, a three-judge panel of this Court affirmed the trial court's order granting Gathright's presentence request to withdraw his guilty plea. In affirming, the panel relevantly indicated the following:

> In ***Commonwealth v. Carrasquillo***, 78 A.3d 1120 (Pa.Super. 2013) (*en banc*),[4] this court examined this issue; namely, whether the defendant's assertion "I didn't commit this crime" as part of his allocution statement at sentencing was a fair and just reason to withdraw his guilty plea. The ***Carrasquillo*** [*en banc* panel], after a thorough analysis beginning with the two-part standard enunciated by our Supreme Court in ***Forbes***,[5] determined that "Appellant's presentence assertion of innocence is a 'fair and just' reason to grant his guilty plea withdrawal." ***Id.*** at 1128.

---

[4] After this Court filed its *en banc* decision, the Commonwealth filed a petition for allowance of appeal in ***Carrasquillo***, which the Supreme Court granted on February 19, 2014, in order to clarify the criteria governing the disposition of a presentence motion to withdraw a guilty plea. ***See Commonwealth v. Carrasquillo***, 624 Pa. 503, 86 A.3d 830 (2014) (*per curiam* order). Accordingly, when the three-judge panel of this Court filed its unpublished memorandum in the instant case on February 12, 2014, the Commonwealth's petition for allowance of appeal in ***Carrasquillo*** was pending before the Supreme Court.

[5] ***Commonwealth v. Forbes***, 450 Pa. 185, 299 A.2d 268, 271 (1973).

> In the instant case, [Gathright] claimed [*sic*] clearly and unconditionally declared that he was innocent. Accordingly, the first prong of the two-part test enunciated in **Forbes** was met.

**Commonwealth v. Gathright**, No. 2065 EDA 2012, at 7-8 (Pa.Super. filed 2/12/14) (unpublished memorandum) (footnotes added).

The panel next considered whether Gathright's withdrawal of his guilty plea would substantially prejudice the Commonwealth. **Id.** at 8. The panel held that "this court's point of inquiry with regard to substantial prejudice is the Commonwealth's ability to try its case. Had [Gathright] never pleaded guilty, the Commonwealth would have been in the same position in which it presently finds itself." **Id.** at 10-11 (citation omitted). Accordingly, the panel concluded the trial court did not abuse its discretion in finding there would be no substantial prejudice to the Commonwealth in permitting Gathright to withdraw his guilty plea. **Id.** at 11. Thus, the panel of this Court affirmed. **See id.**

On March 14, 2014, in the instant case, the Commonwealth filed a petition for allowance of appeal to our Supreme Court. While the Commonwealth's petition was pending in the Supreme Court with regard to the instant case, the Supreme Court reversed this Court's *en banc* decision in **Carrasquillo**. Specifically, in **Commonwealth v. Carrasquillo**, 631 Pa. 692, 115 A.3d 1284 (2015), our Supreme Court relevantly held the following:

> Presently, we are persuaded by the approach of other jurisdictions which require that a defendant's innocence claims must be at least plausible to demonstrate, in and of itself, a fair and just reason for presentence withdrawal of a plea. More

broadly, the proper inquiry on consideration of such a withdrawal motion is whether the accused had made some colorable demonstration, under the circumstances, such that permitting withdrawal of the plea would promote fairness and justice. The policy of liberality remains extant but has its limits, consistent with the affordance of a degree of discretion to the common pleas courts.

*Id.* at 705-06, 115 A.3d at 1292.

Thus, concluding that the court of common pleas did not abuse its discretion in finding the defendant's assertion of innocence was incredible, the Supreme Court held the court of common pleas did not err in denying the presentence motion to withdraw the guilty plea. **See id.** Consequently, the Supreme Court reversed this Court's *en banc* decision and remanded for the reinstatement of the judgement of sentence. **See Carrasquillo**, **supra**.

Thereafter, with regard to the instant case, the Supreme Court granted the Commonwealth's petition for allowance of appeal, vacated this Court's decision, and remanded for consideration by the trial court consistent with the Supreme Court's opinion in **Carrasquillo**. **Commonwealth v. Gathright**, 632 Pa. 447, 121 A.3d 434 (2015) (*per curiam* order).

Upon remand, the trial court held a hearing on January 29, 2016, at which no new evidence was presented but the attorneys presented argument in light of the Supreme Court's opinion in **Carrasquillo**. By order entered on April 22, 2016, the trial court denied Gathright's presentence motion to withdraw his guilty plea, and on June 24, 2016, following a sentencing hearing, the trial court imposed an aggregate of twenty years to forty years

in prison. Gathright filed a timely, counseled post-sentence motion,[6] which was deemed denied by operation of law, and this timely appeal followed. The trial court did not order Gathright to file a Pa.R.A.P. 1925(b) statement, and consequently, no such statement was filed. However, the trial court filed a Pa.R.A.P. 1925(a) opinion.

On appeal, Gathright's sole issue is whether the trial court abused its discretion in denying his presentence motion to withdraw his guilty plea. Specifically, Gathright first contends he presented a "plausible" reason, in and of itself, to demonstrate a "fair and just" reason for presentence withdrawal of his guilty plea. He next contends the Commonwealth failed to demonstrate that his withdrawal of the guilty plea would cause substantial prejudice to the Commonwealth.

After the Supreme Court's filing of its Opinion in **Carrasquillo**, this Court recognized:

> [In **Carrasquillo**, the Supreme Court] clarified the parameters of when a pre-sentence motion to withdraw is to be granted based upon an assertion of innocence. Therein, our Supreme Court re-affirmed that the trial court is imbued with the discretion to deny a defendant permission to withdraw a guilty plea, whether that request is tendered before or after sentencing,[7] and we, as an appellate court, can reverse its

---

[6] In his post-sentence motion, Gathright challenged the discretionary aspects of his sentence and claimed the trial court erred in denying his presentence motion to withdraw his guilty plea.

[7] We note that the standard for presentence and post-sentence withdrawal of a guilty plea is not the same. "Post-sentence motions for withdrawal are

- 13 -

decision only when that discretion is abused. Pa.R.Crim.P. 591(A) (emphasis added) ("At any time before the imposition of sentence, the court may, **in its discretion**, permit, upon motion of the defendant, or direct, *sua sponte*, the withdrawal of a plea of guilty or *nolo contendere* and the substitution of a plea of not guilty."). While a pre-sentence motion to withdraw is to be liberally allowed,

> there is no absolute right to withdraw a guilty plea; trial courts have discretion in determining whether a withdrawal request will be granted; such discretion is to be administered liberally in favor of the accused; and any demonstration by a defendant of a fair-and-just reason will suffice to support a grant, unless withdrawal would work substantial prejudice to the Commonwealth.

*Commonwealth v. Baez*, 169 A.3d 35, 38-39 (Pa.Super. 2017) (quoting *Carrasquillo*, *supra* at 1291–92) (footnote omitted) (footnote added) (emphasis in original).

We have further recognized that, in *Carrasquillo*, with regard to a "fair and just" reason, our Supreme Court rejected the application of a bright-line rule that "prohibited, as a matter of law, trial courts from assessing the credibility of an assertion of innocence made in the context of a presentence motion to withdraw a guilty plea." *See Commonwealth v. Johnson-Daniels*, 167 A.3d 17, 23-24 (Pa.Super. 2017) (citation omitted). Further, this Court has recognized that, in *Carrasquillo*, the Supreme Court observed:

---

subject to higher scrutiny since courts strive to discourage entry of guilty pleas as sentence-testing devices. A defendant must demonstrate that **manifest injustice** would result if the court were to deny his post-sentence motion to withdraw a guilty plea." *Commonwealth v. Islas*, 156 A.3d 1185, 1188 (Pa.Super. 2017) (citation omitted; emphasis in original)

> [T]he proper inquiry on consideration of such a withdrawal motion is whether the accused has made some colorable demonstration, under the circumstances, such that permitting withdrawal of the plea would promote fairness and justice. The policy of liberality remains extant but has its limits, consistent with the affordance of a degree of discretion to the common pleas courts.

*Carrasquillo*, *supra* at 1292.

> In *Carrasquillo*, the Court noted that the determination of whether there is a "fair and just reason" to permit the pre-sentence withdrawal request should be based on the totality of the circumstances attendant at the time of the request, including the timing of the assertion of innocence, the statements made by the defendant in association with his declaration of innocence, and the plausibility of the defendant's statements in light of the evidentiary proffer made by the Commonwealth at the plea hearing. *See id.* at 1286, 1292–93.

*Johnson-Daniels*, 167 A.3d at 24.

In the case *sub judice*, in addressing whether Gathright provided a "fair and just" reason for the presentence withdrawal of his guilty plea in light of the holdings of *Carrasquillo*, the trial court relevantly indicated the following upon remand:

> In *Carrasquillo*, the Pennsylvania Supreme Court determined that "a bare assertion of innocence" is not sufficient justification for the withdrawal of a guilty plea. The Commonwealth asserts that in the instant case [Gathright] made a bare assertion of innocence. The Commonwealth correctly notes that there is strong evidence against [Gathright]. Because both minor victims tested positive for gonorrhea, there is no question that the minor victims were raped; there is only a question of whether some else was the perpetrator. Both of the victims were ready to testify at the time of trial that it was their uncle [(Gathright)] that had raped them. The mother of K.B. and the father of A.B. were also ready to testify at trial. Two-year-old K.B.

- 15 -

had told her mother that "Uncle Ro-Ro[8] hurt [her] pootie cat." A.B., who was ten at the time of the offenses, disclosed to her aunt that [Gathright] had inserted his penis into her vagina on two occasions and she had seen [Gathright] insert his penis into K.B.'s vagina on two occasions. Furthermore, the parents were willing to testify that only [Gathright] and [R.F.], the husband of K.B.'s mother, had the opportunity to be alone with both K.B. and A.B.

[Gathright], however, argue[d] [on remand] that he has made some colorable demonstration of innocence. [Gathright] noted that he filed an alibi defense. . . [Gathright's] criminal accusations do not involve only one incident at a particular date and time. A.B. stated that [Gathright] inserted his penis in her vagina and K.B.'s vagina two times in the summer of 2008. . . [Gathright] does not have a witness that could testify that [Gathright] could not have raped K.B. and A.B. because he or she was with [Gathright] the entire summer of 2008. "An alibi which leaves it possible for the accused to be guilty, is no alibi at all." The notices of alibi witnesses that were filed by [Gathright] are not alibi defenses because they still leave open the possibility that [Gathright] [ ] commit[ted] the crime.

Additionally, defense counsel noted that [Gathright] tested negatively for gonorrhea. K.B.'s mother began noticing that two-year-old K.B. had a vaginal discharge in the summer of 2008. In the [sic] September of 2008, K.B. tested positively for gonorrhea. It was not until December 2008 that [Gathright] turned himself in and tested negative for gonorrhea. A former sexual partner of [Gathright] testified at trial, on behalf of the Commonwealth, that she tested positive for gonorrhea. The Commonwealth also had a witness who would testify that a person may be spontaneously cured of gonorrhea by their body's own mechanisms and that if [Gathright] received antibiotics or penicillin this could have cured the gonorrhea.

Finally, [Gathright] noted that the mother of K.B. first suspected her husband, [R.F.], as the perpetrator. . .However, [R.F.] was also tested for gonorrhea the day after K.B. was diagnosed with gonorrhea [and he tested negative]. He cooperated with the child abuse investigation, and the Department of Human Services cleared him of wrongdoing.

Also weighing against the plausibility of [Gathright's] innocence claim is the fact that at the guilty plea colloquy

_____

[8] K.B. was prepared to testify that "Uncle Ro-Ro" refers to Gathright.

[Gathright] made only one minor objection to the summary of facts that supported the plea. After the district attorney read the summary of facts that supported the plea, the [trial] court asked [Gathright], "do you have any substantial changes or corrections or modifications of the facts that she stated?" [Gathright] noted that the assistant district attorney misspoke when she stated that he had not been tested until September 2008 but he actually had not been tested until December 2008. However, [Gathright] did not otherwise object to the summary of the facts supporting his guilty plea.

Furthermore, after the guilty plea was entered on May 17, 2011, [Gathright's] sentencing was scheduled for August 11, 2011. [Gathright] waited until August 10, 2011, one day before the hearing, before filing a motion to withdraw the guilty plea. The fact that [Gathright] waited until the day before sentencing to seek to withdraw the guilty plea indicates that [Gathright] was not seeking to withdraw the guilty plea because he was innocent but that he was withdrawing the guilty plea to postpone sentencing.

Because [Gathright] has not made a plausible innocence claim, there is not a fair and just reason for withdrawing the guilty plea.

Trial Court Opinion, filed 6/6/17, at 3-6 (citation omitted) (citations to record omitted) (footnote added).

In considering the totality of the circumstances, we conclude the trial court did not abuse its discretion in finding Gathright's assertion of innocence was not plausible so as to demonstrate a "fair and just reason" for the presentence withdrawal of his guilty plea. *See Baez*, *supra*. Specifically, Gathright made his assertion of innocence on the day before the scheduled sentencing hearing and, in light of the evidentiary proffer made by the Commonwealth at the plea hearing, the trial court did not abuse its discretion in finding Gathright's assertion was not plausible. *See id.* Further, we note

- 17 -

J-S26040-18

the statements made by Gathright at the hearing in association with his declaration of innocence reveal that Gathright sought to withdraw his guilty plea, in part, because he was worried about the length of the sentence, which the trial court might impose in connection with his open guilty plea. N.T., 6/20/12, at 32. Such concern does not demonstrate a "fair and just reason" for granting a presentence withdrawal of guilty plea request.

Having found the trial court did not abuse its discretion in concluding Gathright's claim of innocence was not plausible so as to demonstrate a "fair and just reason" for presentence withdrawal of Gathright's guilty plea, we, similar to the trial court on remand, decline to address whether the Commonwealth would suffer substantial prejudice by permitting the withdrawal.

For all of the foregoing reasons, we affirm.

Affirmed.

P.J.E. Bender joins the memorandum.

Judge Bowes concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/30/18

- 18 -